UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

ADOU KOUADIO,

                              Petitioner,

   -against-

THOMAS DECKER, as Field Office Director,
New York City Field Office, U.S. Immigration and
Customs Enforcement; KIRSTJEN NIELSEN, as
Secretary, U.S. Department of Homeland Security;
and JEFFERSON B. SESSIONS III, as Attorney
General, U.S. Department of Justice,

                              Respondents.

------------------------------------------------------------- X

**OPINION AND ORDER GRANTING PETITION OF HABEAS CORPUS**

18 Civ. 7684 (AKH)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-27-2018

ALVIN K. HELLERSTEIN, U.S.D.J.:

      Petitioner Adou Kouadio ("Petitioner"), a citizen of Ivory Coast seeking asylum in the United States, was taken into custody at the U.S. border on February 21, 2016. He has been detained ever since—approximately 34 months at present writing, while his petition for asylum remains pending. He petitions for habeas corpus, claiming that his indefinite detention without an opportunity for bail violates the Due Process Clause of the Fifth Amendment. I grant the petition, holding that Petitioner's continued detention without a bond bearing violates his due process rights as an arriving non-resident alien, limited as those rights are.

**I. Background**

    **a. Immigration Proceedings**

      For the purposes of this opinion, I accept as true the facts alleged in the First Amended Petition. On February 21, 2016, Petitioner was detained at the El Paso, Texas border crossing. First Amended Petition ("Pet."), ECF No. 13, ¶ 12. He expressed an intent to seek

1

asylum, which entitled him to a credible-fear interview under 8 U.S.C. § 1225(b)(1)(B). Pet. ¶¶ 12-13. At the conclusion of that interview, on March 14, 2016, a U.S. Citizenship and Immigration Services asylum officer found that Petitioner had demonstrated a credible fear of persecution in Ivory Coast based on his political opinions. Pet. ¶ 13.

On March 17, 2016, Immigration and Customs Enforcement ("ICE") served Petitioner with a Notice to Appear charging him as a removable "arriving alien" under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I), and commencing removal proceedings against him. Pet. ¶ 14. ICE interviewed Petitioner and, on April 11, denied his parole request and ordered him detained, stating that he had failed to establish that he was not a flight risk and that he was not a danger to the community or the United States' security. Government's Opposition Memorandum ("Opp."), ECF No. 17, at 6; *see also* 8 U.S.C. § 1182(d)(5)(A).

Petitioner's removal proceedings in Texas were subject to repeated delays. Petitioner appeared before an immigration judge ("IJ") on May 3, 2016, Pet. ¶ 15, and, again, on May 20 with counsel. Pet. ¶ 16. The government failed to engage a Twi language interpreter, so his case was adjourned to July 6, 2016. Pet. ¶ 16. On July 6, Petitioner submitted his application for asylum and a merits hearing was scheduled for August 24. Pet. ¶ 17. The absence of an interpreter caused Petitioner's merits hearing to be delayed twice more, first on August 24 and again on September 28. Pet. ¶¶ 18-19. Petitioner then moved to change venue to New York in order to have better access to an interpreter and to his family. Pet. ¶ 19. The motion was granted on October 25. Opp. at 4. By that time, Petitioner had been detained for eight months.

At Petitioner's first hearing at the Varick Street Immigration Court in New York City, on November 29, 2016, Petitioner's case was adjourned to December 5 to allow Petitioner to secure new counsel in New York. Pet. ¶ 20. Petitioner's December 5 hearing was adjourned after ICE failed to produce Petitioner. Pet. ¶ 21. Petitioner appeared with counsel on January 12, 2017, at which time the IJ scheduled Petitioner's merits hearing for April 11, 2017. Pet. ¶ 22. Petitioner's counsel requested and obtained adjournment of the April 11 hearing date to April 26. Opp. at 4. Petitioner's merits hearing began on April 26 and was continued to May 12 to allow more time for the presentation of additional evidence. Pet. ¶ 23. On May 19, 2017, an IJ denied Petitioner's application and ordered his removal to Ivory Coast. Pet. ¶ 25. He then had been detained for 15 months.

Petitioner timely appealed the decision to the Board of Immigration Appeals, which dismissed his appeal on October 13, 2017. Pet. ¶ 26. On November 13, 2017, Petitioner filed a petition for review with the Second Circuit. Pet. ¶ 27. The Second Circuit ordered his removal stayed on September 21, 2018, Pet. ¶ 28, and his appeal remains pending. On October 13, 2018, Petitioner filed an amended petition for habeas corpus pursuant to 28 U.S.C. § 2241, asking this court to grant immediate release or, in the alternative, a hearing at which the government must demonstrate why his continued detention is justified (ECF No. 13).

Petitioner has a clean record, never having been arrested or convicted. Petitioner's First Reply Memorandum of Law, ECF No. 20, at 19. There is little risk of flight, since he seeks asylum within the United States, and little risk of danger to the community, judging from his lack of a prior criminal history. Yet, Petitioner has suffered 34 months of detention without an opportunity for a bond hearing while waiting for a final decision on his petition for asylum.

### b. Treaty Obligations and Implementing Legislation

The United States' processes for handling asylum applications are rooted in its treaty obligations and implementing statutes. In 1968, the United States acceded to the 1967 United Nations Protocol Relating to the Status of Refugees, which "incorporates by reference Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees." *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999). Article 34 of the Convention provides that "[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees" and "make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings." 189 U.N.T.S. 150 (July 28, 1951). Congress implemented the principles of Article 34 in amendments to the Immigration and Nationality Act ("INA"), particularly the 1980 Refugee Act, by providing a framework for discretionary grants of asylum to refugees by the Executive Branch. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987).

### c. Statutory Framework for Mandatory Detention

According to statute, arriving aliens seeking asylum are subject to mandatory detention during the pendency of their applications for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii) ("If the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum."). Also, according to statute, the only means of release from detention is a provision for parole within the unreviewable discretion of the Department of Homeland Security on two grounds: "urgent humanitarian reasons," and "significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. §§ 212.5(b) and (c), 235.3(b)(2)(iii) and (4)(ii) (describing situations in which parole may be appropriate). There is no provision for a hearing, a record, or

4

disclosure of the reasons for a decision, and no provision for appeal, either administratively or to a court of record.

## II. Analysis

### a. Habeas Corpus Jurisdiction

A district court may "grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241).

### b. Mandatory Detention Provided by Statute

In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Supreme Court held that the removal provisions of the INA that apply to the detention of aliens seeking to enter or remain in the United States, 8 U.S.C. §§ 1225(b), 1226(a),(c), do not require periodic bond hearings. The Court remanded the case to the Ninth Circuit for it to consider whether the Due Process Clause constitutionally requires bond hearings for several categories of aliens, including non-resident aliens arriving at the U.S. border and detained pending resolution of their asylum claims pursuant to 8 U.S.C. § 1225(b).[1] 138 S. Ct. at 851. *Jennings* also vacated a Second Circuit decision that had held that 8 U.S.C. § 1226(c), pertaining to aliens who were subjected to removal proceedings because of prior convictions, was sufficiently ambiguous to require a bond hearing if detention lasted beyond six months. *Shanahan v. Lora*, 138 S. Ct. 1260, 200 L. Ed. 2d 415 (2018) (vacating *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015)).

This case squarely presents the constitutional question (among others) not answered in *Jennings*: whether an indefinitely lengthy detention of a non-resident alien seeking

---

[1] The Ninth Circuit, in turn, remanded to the district court. *Rodriguez v. Marin*, 909 F.3d 252, 257 (9th Cir. 2018).

asylum without a bond hearing violates the Due Process Clause of the Fifth Amendment. *See* 8 U.S.C. § 1225(b)(1)(B)(ii).

### c. Scope of Due Process Protection

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [due process] protects," even with respect to detainees who have no legal right to be present in the United States. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Detention in connection with immigration proceedings is permissible only in "certain special and narrow nonpunitive circumstances, . . . , where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). Thus, "[m]any courts . . . have found that [individuals detained pursuant to § 1225(b)] have Due Process rights that require courts to consider challenges to the length of their detentions, even if the detainees' rights are limited in other respects." *Perez v. Decker*, No. 18-CV-5279 (VEC), 2018 WL 3991497, at *3 (S.D.N.Y. Aug. 20, 2018) (Caproni, J.).

The government contends, relying on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), that arriving non-resident aliens have no rights beyond those which a statute may provide. As *Mezei* ruled, "an alien on the threshold of initial entry stands on a different footing [from an alien who has effected entry into the United States]: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" 345 U.S. at 212 (quoting *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) (holding that the Attorney General's decision to exclude the alien spouse of an honorably discharged member of the armed forces was conclusive and unreviewable)).

In *Mezei*, the petitioner, who had resided lawfully in the United States for twenty-five years before traveling "behind the Iron Curtain" for almost two years, *id.* at 214, was denied admission to the United States in February 1950. *Id.* at 208. In May 1950, as the Cold War between the United States and the Union of Soviet Socialist Republics was intensifying, the Attorney General, acting under emergency regulations promulgated by the President, ruled that Mezei's entry would be "prejudicial to the public interest for security reasons." *Id.* Because no other country would accept Mezei, he was held on Ellis Island for 21 months without a bond hearing. *Id.* The Supreme Court held that there was no constitutional violation. *Id.* at 213-215.

The Supreme Court, in *Zadvydas*, expressly declined to consider if "subsequent developments have undermined *Mezei*'s legal authority." 533 U.S. at 694. The petitioners in *Zadvydas* were resident foreign nationals subject to final removal orders based on their prior criminal convictions. 533 U.S. at 678. The United States, unable to arrange repatriation to their home countries, held them indefinitely pursuant to the post-removal-period detention statute, 8 U.S.C. § 1231(a)(6). *Id.* at 682. Interpreting the statute in light of due process concerns, the Supreme Court held that it "implicitly limits an alien's detention to a period reasonably necessary to bring about that alien's removal from the United States, and does not permit indefinite detention." *Id.* at 679. The Court found *Mezei*, to the extent it is good law, inapplicable because the petitioners in *Zadvydas* had effected an entry into the United States, whereas Mezei was detained upon arrival and "'treated,' for constitutional purposes, 'as if stopped at the border.'" *Id.* at 693 (quoting *Mezei*, 345 U.S. at 213). Thus, the Supreme Court applied the *Mezei* distinction, while raising the question of whether *Mezei* remains good law.

Petitioner, although he is being held in the United States, is considered "on the threshold of initial entry" for immigration purposes. *See Leng May Ma v. Barber*, 357 U.S. 185,

7

188 (1958) ("[D]etention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States."). The issue in this case, therefore, is whether the due process principles of *Zadvydas* apply to this case, or whether, instead, *Mezei* forecloses their application.

*Mezei* was decided in the interest of national security, against a petitioner whose detention was authorized under "emergency regulations promulgated pursuant to the Passport Act." 345 U.S. at 214-15. Congress had permitted such regulations to be promulgated "during periods of international tension and strife," 345 U.S. at 210, and the Attorney General's authority to detain Mezei indefinitely arose from President Roosevelt's proclamation of a national emergency for World War II on May 27, 1941. 345 U.S. at 210 n.7. Eight days after the death of Joseph Stalin, with the Korean War raging, and with a new national emergency in place by virtue of a December 1950 proclamation by President Truman, *see Kent v. Dulles*, 357 U.S. 116, 137-38 (1958), that authority "continue[d] in effect during the present emergency." *Mezei*, 345 U.S. at 210. Under the circumstances, the Court found such authority constitutionally permissible. It relied heavily on its decision three years earlier in *Knauff*, in which the Court had emphasized that a "state of war still exist[ed]." 338 U.S. at 546.

It is well-established that national security concerns affect the scope of due process. Determining what process is due requires weighing, *inter alia*, and, as appropriate, "the Government's interest . . . in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict." *Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004); *see also United States v. Salerno*, 481 U.S. 739, 748 (1987) ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous."); *Andrews v. Knowlton*, 509 F.2d

898, 904 (2d Cir. 1975) ("[I]n particularly vital and sensitive areas of government concern such as national security . . . , the private [due process] interest must yield to a greater degree to the governmental.") (internal citations omitted).

The world remains threatening to the United States' interests, but we are far from the dark climate of World War II and the Korean and Vietnamese wars. As the Sixth Circuit held en banc, *Mezei* is limited to the national security context in which it was decided. *See Rosales-Garcia v. Holland*, 322 F.3d 386, 413-414 (6th Cir. 2003) (en banc) ("[T]he *Mezei* Court explicitly grounded its decision in the special circumstances of a national emergency and the determination by the Attorney General that Mezei presented a threat to national security."); *see also Borrero v. Aljets*, 325 F.3d 1003, 1010 (8th Cir. 2003) (Heaney, J., dissenting) (quoting same); *Jennings*, 138 S. Ct. at 867 (Breyer, J., dissenting) (emphasizing the Attorney General's "particularized" findings "not only that Mezei was a security risk and consequently not entitled to either admission or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security"); *Jean v. Nelson*, 472 U.S. 846, 872 (1985) (Marshall, J., dissenting) ("The narrow question decided in *Knauff* and *Mezei* was that the denial of a hearing in a case in which the Government raised national security concerns did not violate due process."); *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1388 (10th Cir. 1981) (distinguishing *Mezei* on several grounds, including that "security risks and enemy aliens during wartime have always been treated specially").[2]

---

[2] Before *Zadvydas*, the Second Circuit applied *Mezei* to an excludable entrant among the Cuban "Mariel" boat people. *See Guzman v. Tippy*, 130 F.3d 64 (2d Cir. 1997). United States District Judge Richard J. Sullivan, in a recent opinion, held that *Mezei* had to be followed. *See Poonjani v. Shanahan*, 319 F. Supp. 3d 644, 647 (S.D.N.Y. 2018) (Sullivan, J.) (denying habeas petition of an arriving alien who had been detained pursuant to section 1225(b) for eighteen months without a bond hearing while his asylum application was considered); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 145 (D.D.C. 2018) (Contreras, J.) ("While Mezei may be under siege, it is

Here, Petitioner is not alleged to present national security concerns and is not being held pursuant to emergency regulations. The government asserted at oral argument that all immigration proceedings implicate the government's national security interest, but it has not alleged that Petitioner's case gives rise to any particularized national security concerns. By contrast, the proceedings against the petitioner in *Mezei* were "grounded on danger to the national security." 345 U.S. at 216. Although the government in *Mezei* would not disclose its evidence of such danger, it claimed that disclosing the evidence "would jeopardize the safety of the Nation." *Id.* at 217 (Black, J., dissenting). The government has made no such representations with respect to Petitioner's case, and the generalized national security interest it articulates is insufficient to trigger the reduction of due process protections recognized in *Mezei*. Accordingly, assuming *Mezei* remains good law, it does not control.

This nation prides itself on its humanity and openness with which it treats those who seek refuge at its gates. By contrast, the autocracies of the world have been marked by harsh regimes of exclusion and detention. Our notions of due process nourish the former spirit and brace us against the latter. The statutory framework governing those who seek refuge, and its provisions for detention, cannot be extended to deny all right to bail.

34 months of detention is too long without an opportunity for bail. *See Perez*, 2018 WL 3991497, at *3 (holding that the nine-month detention of an arriving non-resident alien was unconstitutional). Petitioner enjoys the right of appeal, and his right to asylum and admission into the United States remains open. His right to liberty is as valuable to him as it is

---

still good law . . . ."). Other cases have taken a different view. *See, e.g., Perez*, 2018 WL 3991497, at *6; *Lett v. Decker*, No. 18-CV-4302 (JCM), 2018 WL 4931544, at *4 (S.D.N.Y. Oct. 10, 2018); *Pierre v. Doll*, No. 3:17-CV-1507, 2018 WL 5315203, at *4 (M.D. Pa. Oct. 26, 2018) (Mariani, J.); *Destine v. Doll*, No. 3:17-CV-1340, 2018 WL 3584695, at *4 (M.D. Pa. July 26, 2018) (Caputo, J.).

to any U.S. citizen, and he has a constitutional right to a bail hearing that should no longer be denied to him.

### d. The Burden of Proof at a Bond Hearing

*Lora v. Shanahan* held that detainees must be admitted to bail "unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community." 804 F.3d at 616; *Rodriguez v. Robbins*, 715 F.3d 1127, 1130 (9th Cir. 2013); *see also Hernandez v. Decker*, 2018 WL 3579108, at *10–*11; *Sajous*, 2018 WL 2357266 at *12; *Perez v. Decker*, No. 18-cv-5279 (VEC), 2018 WL 3991497, at *6 (S.D.N.Y. Aug. 20, 2018). There is no merit to the government's argument that the normal burden of proof should shift to petitioner.

## III. Conclusion

Petitioner is entitled to a bond hearing at which the government must show, by clear and convincing evidence, that Petitioner's dangerousness or flight risk justifies his continued detention. Respondents are ordered to provide Petitioner such a hearing within fourteen days of this order. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

Dated: December 7, 2018
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge